IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| T.H.E. INSURANCE COMPANY, | : | |
| Plaintiff, | : | |
| v. | : | Civil Action No. GLR-18-3402 |
| ROBERT FISHER, et al., | : | |
| Defendants. | : | |

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on Plaintiff T.H.E. Insurance Company's ("T.H.E.") Motion for Summary Judgment (ECF No. 93); T.H.E.'s Motion to Strike Report of Defendants' Expert Colin A. Sommer ("Motion to Strike Sommer Report") (ECF No. 102); and T.H.E.'s Motion to Strike Confidential Dispute Resolution Communications in Defendants' Opposition to Plaintiff's Motion for Summary Judgment ("Motion to Strike Confidential Communications") (ECF No. 103).[1] The Motions are ripe for disposition, and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2021). For the reasons outlined below, the Court will grant the Motion to Strike Sommer Report and the Motion to Strike Confidential Communications. Additionally, the Court will grant the Motion for Summary Judgment and enter judgment in T.H.E.'s favor.

---

[1] Also listed as pending on the Court's docket are two Joint Motions to Amend/Correct the Scheduling Order (ECF Nos. 88, 89). The Court previously resolved these Motions by docketing a Second Amended Scheduling Order on November 12, 2020. (ECF No. 90). Accordingly, these Motions will be denied as moot.

# I.   BACKGROUND

## A.   **Factual Background**

This insurance coverage dispute stems from personal injury claims asserted by Defendants Melyndia Davis ("Davis") and Robert Spencer ("Spencer") against Defendants Robert Fisher ("Fisher"), Mary Fisher, and Todd Plank ("Plank") in relation to a hot air balloon accident that occurred in August 2015. Plank and Fisher operate a business known as New Horizon Balloon Team, through which they operate hot air balloon rides in and around Lancaster County, Pennsylvania. (Am. Compl. ¶ 2, ECF No. 60). Fisher, Plank, and Mary Fisher (the "Insureds") are insureds under the T.H.E. insurance policy at issue here.

### 1.   **Insurance Policy**

T.H.E. provided insurance coverage to the Insureds pursuant to the "Hot Air Balloon Liability Coverage Form" (the "T.H.E. Policy" or the "Policy"), which provides insurance for operators of commercial hot air balloon flights through two mutually exclusive coverages with separate limits of coverage. (See T.H.E. Policy at 7, ECF No. 93-6).[2] "Coverage A" applies to claims for bodily injury to persons other than passengers of the hot air balloon and provides limits of $1,000,000 per occurrence. (Id.). "Coverage B" applies to claims for bodily injury to passengers and provides limits of $100,000 per passenger. (Id.). The provision of the Policy that sets forth the coverage under Coverage A states:

---

[2] Page references to T.H.E.'s exhibits refer to the page numbers assigned by the Court's Case Management/Electronic Case Filing system.

**COVERAGE A BODILY INJURY, PROPERTY DAMAGE, PERSONAL AND ADVERTISING INJURY LIABILITY EXCLUDING "PASSENGERS"**

    a.       We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" or "personal advertising injury" sustained by any persons excluding any "passenger" arising out of the "operation of a Hot Air Balloon".

(<u>Id.</u> at 9). As for Coverage B, the policy states:

**COVERAGE B BODILY INJURY, PROPERTY DAMAGE, PERSONAL AND ADVERTISING INJURY LIABILITY BY ANY "PASSENGER"**

    a.       We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" or "personal advertising injury" sustained by any "passenger" arising out of the "operation of a Hot Air Balloon".

(<u>Id.</u> at 10).

Under the Policy, "passenger" is defined as: "any person, other than the 'pilot in command,' in or entering the 'Hot Air Balloon' for the purpose of riding therein or alighting therefrom following a flight or attempted flight, or a crew member." (<u>Id.</u> at 26). The term "Operation of a Hot Air Balloon" means "all activities related to the preparation of a 'Hot Air Balloon' for flight, 'in flight' activities and the landing and repacking of the balloon." (<u>Id.</u>). The term "in flight," as used in the definition of "Operation of a Hot Air Balloon," "means that the 'Hot Air Balloon' shall be deemed to be in flight from the time of unpacking with the intention of inflation and flight, until the envelope is repacked including but not limited to tethered operations." (<u>Id.</u> at 25). Further, "Hot Air Balloon" is defined to include all parts associated with the balloon, including its "gondola," "envelope"

and any "accessories." (Id. at 24). The "gondola" includes the basket holding the pilot and passengers. (Id.). The "envelope" is the fabric suspension system that holds heated air to create lift. (Id.).

> ### 2.    Hot Air Balloon Accident

The accident in which Davis and Spencer were injured (the "Accident") occurred on August 15, 2015. (Compl. in Underlying Action ["Underlying Compl."] ¶¶ 19, 32, ECF No. 93-5). At the time of the accident, Davis and Spencer were riding in a hot air balloon piloted by Fisher. (Id. ¶¶ 20–21.)

Near the conclusion of the trip, the hot air balloon descended for landing in a farm field. (Dec. 13, 2018 Robert Fisher Dep. Tr. ["1st Fisher Dep."] at 12:17–16:19, ECF No. 93-7). After initially touching ground and briefly lifting back up into the air, the basket holding Fisher, Davis and Spencer was grabbed and secured by Fisher's ground crew. (Id.; see also Aug. 15, 2015 Video).[3] When the basket touched down, the balloon's vent line became caught under the basket. (1st Fisher Dep. at 17:12–18:8). The vent line is a rope that controls the opening and closing of a vent at the top of the envelope and which, when open, allows hot air to escape from the envelope. (Id. at 17:17–18:8). When the vent line became caught under the basket, the vent remained open and the envelope began to lose heat, deflate and collapse. (Id. at 17:17–18:23). A member of the ground crew, Ashley Harnish, told Fisher that the envelope was "getting limp, light." (Id. at 17:8–9). When Fisher realized the envelope was getting limp, he knew that he, Davis, and Spencer were

---

[3] T.H.E. submitted the video recording on a CD along with the courtesy copy of its Motion for Summary Judgment. (See ECF No. 93-8).

"in a world of trouble" because the envelope would come in contact with the power line. (Id. at 18:9–23; Dec. 15, 2020 Robert Fisher Dep. Tr. ["2nd Fisher Dep."] at 71:23–72:13, 76:2–24, ECF No. 93-9).

As the envelope deflated, wind and gravity caused the envelope to move laterally and downward towards the power line. (2nd Fisher Dep. at 70:13–21, 72:9–73:8). Despite the ground crew's efforts to keep the basket upright, the lateral and downward movement of the envelope also pulled on the basket and caused the basket to begin to tip over. (Id. at 72:9–73:8, 74:4–9). At this point, Fisher, Davis, and Spencer were still standing inside the basket. (Id. at 56:4–15, 75:17–76:1). Fisher then grabbed for the balloon's "top line" rope, which was attached to the top of the envelope, in order to give it to a member of the ground crew so that the ground crew member could try to pull the envelope away from the power line. (1st Fisher Dep. at 27:13–16; 2nd Fisher Dep. at 30:13–31:23). But as Fisher was trying to release the top line from a carabineer, the envelope came in contact with the power line and Fisher began to feel an electric shock. (1st Fisher Dep. at 18:16–19:6). At this time, Fisher, Davis and Spencer were still in the basket and the basket was leaning over. (2nd Fisher Dep. at 75:9–76:1). At the same time, Evans Hart, a member of the ground crew, was standing next to the basket and holding onto the basket. (Evans Hart Dep. ["Hart Dep."] at 39:9–21, 50:14–25, ECF No. 93-11). Hart felt an electric shock and let go of the basket. (Id. at 39:9–40:22, 44:24–45:15, 51:10–20). When Hart let go of the basket, the basket tipped over onto its side. (Id. at 40:16–41:7, 50:14–51:20). Fisher testified that fifteen seconds passed between the time the basket was initially secured by the ground crew until the time that the envelope came in contact with the power line. (2nd Fisher Dep. at

5

71:16–22). Fisher's normal practice and procedure during landing was to instruct passengers when it was safe to exit the basket. (Id. at 67:19–23). Fisher testified that he did not instruct Davis or Spencer that it was safe to exit the basket before the electrical shock occurred. (Id. at 67:24–68:3; 1st Fisher Dep. at 26:17–27:16).

As a result of the envelope coming in contact with the power line, electricity traveled from the power line through the balloon cables to metal components of the basket, and ultimately passed through Fisher, Davis, and Spencer's bodies to the ground. (NTSB Factual Report at 3–4, ECF No. 93-10; see also Expert Report of John Loud, MSEE, PE, CFEI ["Loud Report"] at 6, ECF No. 93-12). Neither Davis nor Spencer have any memory of the Accident. (Davis & Spencer Resp. to Interrog. at No. 23, ECF No. 93-13). Fisher testified that after the electric shock concluded, he found both Davis and Spencer laying with their bodies partially inside of the balloon's basket. (1st Fisher Dep. at 20:17–24). During his deposition, Fisher drew outlines of Davis and Spencer's bodies on a photograph of the basket after it had tipped over to indicate their positions when he saw them after the electric shock ended. (Id. at 28:20–30:4). Davis's body from the chest down was inside the basket. (Id. at 20:19–24, 30:1–4). Spencer's body was inside of the basket from the knees down. (Id. at 20:19–24, 29:14–25). Similarly, Hart testified that after the basket tipped over and the electricity stopped "sparking," both Davis and Spencer were "half in, half out" of the balloon's basket. (Hart Dep. at 40:23–41:12). Fisher pulled Davis out of the basket. (1st Fisher Dep. at 20:19–21:20). Fisher also pulled Spencer out of the basket and away from the balloon. (Id. at 21:24–22:18).

### 3.     T.H.E.'s Investigation

Fisher promptly reported the Accident to his insurance agent, The Schantz Agency. (2nd Fisher Dep. at 29:14–18). Fisher explained to Mr. Schantz how the Accident occurred and that his passengers, Davis and Spencer, were injured by the electrical shock. (Id. at 30:13–31:23). On August 17, 2015, Schantz reported the claim to T.H.E.'s claims manager, John Sutack, and conveyed the information Fisher had told him, including that Davis and Spencer were in the basket at the time of the Accident. (John Sutack Dep. ["Sutack Dep."] at 12:16–13:16, ECF No. 93-14). Sutack also reviewed a news article about the Accident. (Id. at 13:9–16). Sutack then opened the claim under Coverage B and set reserves of $100,000 per passenger for Davis and Spencer's claims. (Id. at 12:16–13:16; see also WINS Set-Up Form at 2, ECF No. 93-15).

The claim was then assigned to T.H.E. senior claims specialist Barbara Fellows. As part of her initial investigation of the claim and determination of the applicable coverage, Fellows interviewed Fisher on August 20, 2015. (See T.H.E. Claim File at 2, ECF No. 93-17). Fellows took detailed handwritten notes of her conversation with Fisher, (see Fellows Notes at 2–5, ECF No. 93-18), and typed a summary of their conversation into the notes section of the T.H.E. computer-based claims file, (see T.H.E. Claim File at 2–3). Fellows' notes reflect that Fisher gave her a detailed description of how the Accident occurred and how Davis and Spencer were injured. Fellows' typed notes reflect that Fisher told her:

> One of the crew yelled to Bob [Fisher] that the balloon was lax,
> so [Fisher] looked and noticed the balloon was loosing [sic]
> heat too quickly. When they had landing [sic] the vent line was
> caught under the basket. [Fisher] pulled the vent line free but
> the balloon was now limp and elongated and started to lean

> towards the [power] lines. [Fisher] and his passenger [sic] were
> shocked by the power line. [Fisher stated] that he felt it went
> on for 5 [seconds] or so and he came to going to [the] male
> passenger who was breathing – the basket had fallen [over]
> during their shock so they were all half way in and out of the
> basket. He saw the female was not breathing. In panic and for
> safety, since there was live propane in the balloon the [insured]
> pulled the lady 10 [feet] from the basket and send [sic] to
> retrieve the male who was heavier so a crew member assisted
> in moving the man.

(Id. at 2). Fellows' handwritten notes of her interview of Fisher are similar. Fellows' notes

state:

> The balloon was above light/limp fluttering. Then the balloon
> was electrocuted. Bob yelled fell out of basket. Basket layed
> [sic] over. . . . Passengers still in basket [and] on the ground.
> He ran around basket. Grabbed female out of the basket. Came
> back to male. 200 [pounds] he tried pulling him out.

(Fellows Notes at 3–4).

Based on Fisher's detailed description of the Accident, Fellows determined that

Davis and Spencer were "passengers" who were injured during the "Operation of a Hot Air

Balloon" as those terms are defined in the Policy. (Barbara Fellows Dep. ["Fellows Dep."]

at 25:21–26:19, ECF No. 93-16). Therefore, Fellows determined that Coverage B of the

Policy applied to Davis and Spencer's claims. (Id.). Fellows then sent an email and letter

to Fisher to advise him that the available limits under the Policy were $100,000 to each

passenger as provided by Coverage B. (See Aug. 20, 2015 Email at 2, ECF No. 93-19;

Aug. 20, 2015 Letter at 2, ECF No. 93-20). On September 21, 2015, T.H.E. offered to settle

Davis and Spencer's claims against the Insureds for the full $100,000 per passenger limits

provided by Coverage B. (See Sept. 21, 2015 Letters, ECF No. 93-21).

On February 22, 2016, Fellows received copies of the National Transportation Safety Board's ("NTSB") initial investigation documents, including summaries of interviews with Spencer and Fisher and photographs of the Accident taken by witnesses. (See Initial NTSB Docs. at 2–16, ECF No. 93-22). On August 8, 2016, Fellows received the NTSB's factual report on the Accident (the "Factual Report"). (See NTSB Factual Report at 2). The Factual Report states: "As the basket was secured, with the passengers still inside, the balloon draped over the powerlines and started to smoke." (Id. at 4). The Report also states that when the balloon made contact with the power line, "the result was an electrical arc that went from the powerlines through the balloon cables to the basket, and electrocuted the pilot and the passengers." (Id. at 3).

**B.**   **Procedural History**

**1.**   **2016 Litigation & Settlement Discussions**

On July 7, 2016, Davis and Spencer filed suit against the Insureds (the "Underlying Action"). See Melyndia Davis, et al. v. Robert Fisher, et al., 1:16-cv-2496-GLR (D.Md. filed July 7, 2016).

On or about April 25, 2017, Davis and Spencer rejected T.H.E.'s settlement offer of $100,000 per passenger, which represented the limits of the policy under Coverage B, because they took the position that Coverage A applied to their claims because they were outside the balloon's basket—and therefore no longer passengers—at the time they were injured. (See Apr. 25, 2017 Email at 2–4, ECF No. 93-31).

On May 22, 2018, Davis and Spencer demanded $999,999 to settle their claims against the Insureds, which Davis and Spencer's counsel stated was an attempt to settle for

less than the amount of Coverage A. (May 22, 2018 Letter at 2, ECF No. 93-26). Counsel

for Insureds, Daniel Karp, responded with a letter dated May 24, 2018, stating that T.H.E.'s

settlement offer was "the same as it has always been, namely, policy limits in the amount

of $100,000.00 per Plaintiff." (May 24, 2018 Letter at 2, ECF No. 93-27).

On May 30, 2018, Davis and Spencer's counsel wrote to Karp to provide an

explanation for the argument that Davis and Spencer were not passengers when they were

injured and that therefore Coverage A applied. (May 30, 2018 Letter at 2–4, ECF No. 93-

28). On or about June 5, 2018, before further responding to the $999,999 settlement

demand, T.H.E. retained coverage counsel to represent T.H.E.'s interests and address

Davis and Spencer's position that Coverage A applied. (Michael Testone Dep. ["Testone

Dep."] at 13:20–14:10, ECF No. 93-29).

On June 11, 2018, T.H.E.'s coverage counsel sent a letter to the Insureds, with a

copy to Davis and Spencer's counsel and Karp, explaining T.H.E.'s position that Coverage

B applied to the claim. (See June 11, 2018 Letter, ECF No. 93-30). The June 11, 2018 letter

first dismissed Davis and Spencer's contention that they had exited the basket moments

prior to the electric shock, explaining that the evidence demonstrated that Davis and

Spencer were in fact inside the balloon basket when the electrical shock began. (Id. at 6–

7). The letter also explained that, even if Davis and Spencer were correct that the balloon

had landed and Davis and Spencer had exited the basket before they were injured, Davis

and Spencer would still be considered "passengers" based on the Policy's definitions and

under applicable and analogous case law. (Id.). Specifically, because the Policy defined

"passenger" to include someone "alighting" from the hot air balloon, even if Davis and

Spencer were shocked while exiting the basket, they would still be considered to be alighting from the balloon under Pennsylvania law. (Id.). The letter therefore concluded that Coverage B, not Coverage A applied. (Id. at 7–8).

On August 12, 2019, Davis and Spencer entered into a settlement agreement with the Insureds (the "Settlement Agreement") in which Fisher agreed to pay Davis and Spencer $11.7 million plus interest. (Am. Compl. ¶ 41–42). T.H.E. was not a party to and did not execute the Settlement Agreement, nor did it consent to the Insureds' entering into the Settlement Agreement. (Id. ¶¶ 41, 43). The Court entered a consent judgment and closed the Underlying Action on August 15, 2019. (Id. ¶ 44).

### 2. Present Litigation

On June 15, 2018, while the Underlying Action was still pending, T.H.E. filed the present declaratory judgment action against Davis, Spencer, and the Insureds (hereinafter, "Defendants") in the United States District Court for the Eastern District of Pennsylvania. (ECF No. 1). The case was subsequently transferred to this Court on November 2, 2018. (ECF No. 19).

On June 28, 2019, this case was stayed pending resolution of the Underlying Action. (ECF No. 54). After the Underlying Action was closed on August 15, 2019, the Court lifted the stay on October 7, 2019. (ECF No. 59).

On October 18, 2019, T.H.E. filed an Amended Complaint against Defendants. (ECF No. 60). The Amended Complaint added factual allegations related to the settlement of the Underlying Action and the parties' present insurance coverage dispute. (See Am.

Compl. ¶¶ 40–58). T.H.E.'s one-count Amended Complaint seeks a declaratory judgment stating that:

> The $100,000 limit of liability for each passenger provided under Coverage B of the Policy is the maximum insurance coverage available under the Policy for the claims asserted against the [I]nsureds in the Underlying Action and to indemnify the [I]nsureds for liability they have incurred to Davis and Spencer in the Judgment in the Underlying Action. . . . Therefore, $200,000 is the maximum insurance coverage available under the Policy to indemnify the insureds for the Judgment in the Underlying Action.

(Id. ¶¶ 61–62).

On November 11, 2019, Davis and Spencer filed counterclaims against T.H.E. for contractual bad faith (Count I) and statutory bad faith (Count II). (Am. Answer & Countercls. ¶¶ 94–100, ECF No. 63). Davis and Spencer seek compensatory and punitive damages and attorneys' fees. (Id. at 19).

On December 13, 2019, Defendants moved for judgment on the pleadings. (ECF No. 67). The Court denied Defendants' motion on June 8, 2020 and subsequently entered a Scheduling Order to commence discovery. (ECF Nos. 78, 79).

On January 15, 2021, after the conclusion of discovery, T.H.E. filed a Motion for Summary Judgment. (ECF No. 93). Defendants filed their Opposition, which served in part as a cross-motion for summary judgment, on February 16, 2021. (ECF No. 98). T.H.E. filed its Opposition to Defendants' Cross-Motion for Summary Judgment and Reply in Support of its Motion for Summary Judgment on March 8, 2021. (ECF No. 101). On March 29, 2021, Defendants filed a Reply in Support of their Cross-Motion for Summary Judgment. (ECF No. 106).

T.H.E. filed its Motion to Strike Report of Defendants' Expert Colin A. Sommer and its Motion to Strike Confidential Dispute Resolution Communications in Defendants' Opposition to Plaintiff's Motion for Summary Judgment on March 8, 2021. (ECF Nos. 102, 103). Defendants filed their Oppositions on March 29, 2021. (ECF Nos. 107, 108). On April 13, 2021, T.H.E. filed its Replies. (ECF Nos. 114, 115).

## II.   DISCUSSION

### A.   <u>Motions to Strike</u>

#### 1.   **Sommer Report**

T.H.E. moves to strike the expert report of Colin A. Sommer (the "Sommer Report"), which Defendants attached to a previous dispositive motion, (<u>see</u> ECF No. 30-1), and upon which Defendants rely in their Opposition. T.H.E. moves to strike the Report pursuant to Federal Rule of Evidence 702 and the Supreme Court's ruling in <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993). Federal Rule of Evidence 702 governs the admissibility of expert testimony. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)   the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b)   the testimony is based on sufficient facts or date;
> (c)   the testimony is the product of reliable principles and methods; and
> (d)   the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Ev. 702. Under Rule 702 and <u>Daubert</u>, a district court "must ensure that the expert is qualified and that the expert's testimony is both relevant and reliable." <u>See</u> <u>United States v. Smith</u>, 919 F.3d 825, 835 (4th Cir. 2019) (citing <u>Daubert</u>, 509 U.S. at 589). A district court has a "gatekeeping responsibility to 'ensur[e] that an expert's testimony both rests on a <u>reliable</u> foundation and is <u>relevant</u> to the task at hand.'" <u>Nease v. Ford Motor Co.</u>, 848 F.3d 219, 229 (4th Cir. 2017) (quoting <u>Daubert</u>, 509 U.S. at 597). This standard applies to scientific expert testimony as well as testimony based on "technical" and "other specialized" knowledge. <u>See</u> <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 141 (1999).

For an expert's opinion to be admissible, "the proposed expert testimony must have 'a valid scientific connection to the pertinent inquiry.'" <u>Nease</u>, 848 F.3d at 229 (quoting <u>Daubert</u>, 509 U.S. at 592). The evidence or testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue." <u>McCoy v. Biomet Orthopedics, LLC</u>, No. ELH-12-1436, 2021 WL 252556, at *10 (D.Md. Jan. 25, 2021) (citing <u>Daubert</u>, 509 U.S. at 591). "To be reliable, the testimony 'must be based on scientific, technical, or other specialized <u>knowledge</u> and not on belief or speculation, and inferences must be derived using scientific or other valid methods.'" <u>Belville v. Ford Motor Co.</u>, 919 F.3d 224, 232–33 (4th Cir. 2019) (quoting <u>Oglesby v. General Motors Corp.</u>, 190 F.3d 244, 250 (4th Cir. 1999)).

Here, T.H.E. contends that the Sommer Report is inadmissible because the opinions contained therein are not based on evidence in the record. At bottom, the Court agrees. Defendants submit the Sommer Report as "physical evidence" that Davis and Spencer exited the basket prior to the electrical shock and that they could not have received a shock

if they were in the basket. (Defs.' Opp'n Mot. Summ. J. ["Opp'n"] at 16, 31, ECF No. 98).

To reach this conclusion, Defendants rely on the following statement in the Report:

> [T]he light wind caused the envelope to drift further towards the power transmission lines and, as a result, the envelope caused the basket to tilt then fall onto its side. At this point, <u>the remaining occupants of the basket [Davis and Spencer] would have egressed to extricate themselves from the basket</u>.

(Sommer Report at 4, ECF No. 30-1 (emphasis added)). Further, Sommer notes that:

> The three persons who were injured as a result of the electric current flow were Mr. Fisher, who had acted as pilot of the balloon when it was flying and had exited the basket to help stabilize it at the time of the arcing, and <u>the two individuals who had were [sic] exiting the basket after the completion of the flight and the subsequent upset of the basket, Mr. Spencer and Ms. Davis</u>. These three would all have been in the most likely position to have direct contact with the stainless steel cables that exhibited the arcing in the photo above.

(<u>Id.</u> at 10 (emphasis added)). Sommer also opines that "Mr. Spencer and Ms. Davis would have <u>crawled out of the basket</u> and the area of the balloon after the basket fell to its side." (<u>Id.</u> at 11 (emphasis added)).

It appears that, in reaching his conclusions, Sommer relied on the assumption that Davis and Spencer had "exited," "crawled out of," or "egressed to extricate themselves from the basket" before the electric shock. However, there is no evidence in the record to that effect; rather, eyewitness testimony suggests that Davis and Spencer were inside the basket when the shock occurred. First, Fisher testified that he, Davis, and Spencer were standing in the basket when the shock began. (<u>See</u> 2nd Fisher Dep. at 75:17–76:1). Additionally, a member of the ground crew testified that he observed Davis and Spencer inside the balloon as the shock began. (<u>See</u> Hart Dep. at 44:19–45:9, 41:10–21). "[A] court

will exclude testimony . . . when not supported by the record." <u>Young v. Swiney</u>, 23 F.Supp.3d 596, 612 (D.Md. 2014) (citations omitted). Thus, Sommer's testimony regarding the location of Davis and Spencer at the time they began receiving the electrical shock must be excluded.

Separately, T.H.E. contends that the Sommer Report must be excluded because Sommer is not qualified to provide expert testimony on electrical engineering, electrical conductivity, or electrical shock injuries.[4] Once again, the Court agrees. It is well-established that "an expert witness may not offer an opinion where the subject matter goes beyond the witness's area of expertise." <u>Young</u>, 23 F.Supp.3d at 611 (citations omitted); <u>see also</u> <u>Steele v. Kenner</u>, 129 F.App'x 777, 781 (4th Cir. 2005) (affirming district court determination that testimony fell outside expert witness's area of expertise). Indeed, "[t]he fact that a proposed witness is an expert in one area, does not <u>ipso facto</u> qualify him to testify as an expert in all related areas." <u>Shreve v. Sears, Roebuck & Co.</u>, 166 F.Supp.2d 378, 391 (D.Md. 2001) (citations omitted); <u>see also</u> <u>Trumps v. Toastmaster, Inc.</u>, 969 F.Supp. 247, 252 (S.D.N.Y. 1997) (finding that a mechanical engineer was not qualified to offer expert testimony regarding malfunction of electric grill that caused a fire, because electrical engineering was outside his field of expertise).

Here, as to the cause of Davis' and Spencer's injuries, Sommer concludes that:

> It is likely that either Mr. Spencer or Ms. Davis was in direct contact with the suspension line as these two individuals

---

[4] T.H.E. also contends that Sommer's methodology used to form his opinions is deficient because he failed to consider factors necessary to scientifically determine how Davis and Spencer's injuries occurred. Because the Court finds that the Sommer Report is inadmissible for other reasons, the Court need not consider this argument.

> sustained the most severe injuries including burns consistent
> with electric shock. Electricity will travel along the lines of
> least resistance, meaning that it will flow through material with
> the greatest conductivity. . . . [A]s the electricity passed
> through the suspension cables, it would have found a good path
> to ground through the bodies of Mr. [S]pencer and Ms. Davis
> as evidenced by their burns and other injuries. The combustion
> indicated by the smoke shown in the photograph taken just
> after the electric shock was likely created from the electric
> combustion of tissue of these individuals and possibly from
> combustion of grass or debris on the ground.

(Sommer Report at 10–11).

Defendants assert that Sommer is qualified to offer this opinion because he "is a professional engineer and aircraft mishap and failure investigator" who "is trained in accident investigation, failure analysis of airframes, pre and post impact fires, metallurgy, pathology, bio medics, crash survivability, materials science, among other aircraft accident investigation issues." (Defs.' Opp'n Pl.'s Mot. Strike Expert Rep. at 2, ECF No. 108). Further, Defendants state that at the time he wrote his report in 2018, Sommer "ha[d] personally investigated over 350 aircraft accidents," including "various aircraft accidents in which the aircraft contacted power lines." (Id. at 3). Defendants also note that Sommer is the "Director of Engineering for an electric vehicle manufacturing company that produces three wheeled electric motorcycles." (Id.). As T.H.E. points out, however, Sommer holds degrees in civil and environmental engineering; he does not have an advanced degree, professional training, or any expertise in electrical engineering. Further, although Sommer has a background in aircraft accident investigation and works for an electric vehicle company, Defendants do not provide any indication that he is qualified to opine on the flow and conductivity of electricity as it relates specifically to electric shock

injuries. Thus, the Court finds that Sommer is not qualified to offer expert testimony regarding the likely cause of Davis' and Spencer's electrical shock injuries.

In sum, Sommer's report is inadmissible because the assumptions therein are not supported by evidence in the record and because Sommer is not qualified as an expert in electric conductivity or electric shock injuries. Accordingly, the Court will grant T.H.E.'s Motion to Strike Sommer Report and will not consider the Report when ruling on T.H.E.'s dispositive motion.

### 2.    Confidential Communications

T.H.E. also moves to strike Defendants' references to statements made during the parties' Court-sponsored settlement conference (the "Communications"), which include references to T.H.E.'s settlement offers and to Magistrate Judge Gauvey's advice, opinions, and observations regarding the parties' settlement negotiations. Specifically, T.H.E. argues that the Communications are inadmissible under Local Rule 607.4 (D.Md. 2021) and Federal Rule of Evidence 408(a). Defendants respond that inclusion of the Communications is permissible under the exception provided in Federal Rule of Evidence 408(b). At bottom, the Court agrees with T.H.E.

On the topic of disclosure of communications made as part of the Court's dispute resolution process, the Local Rules provide the following:

> Confidentiality – The Court's ADR process is confidential. Unless otherwise agreed by the parties and the Court, no disclosure shall be made to anyone, including the judicial officer to whom the case is assigned, of any dispute resolution communication that in any respect reveals the dispute resolution positions of the parties or advice or opinions of neutrals. No such communication shall be admissible in any

subsequent proceeding except as permitted by the Federal
Rules of Evidence.

Local Rule 607.4 (D.Md. 2021). In addition, under Federal Rule of Evidence 408(a),

evidence of settlement offers and statements made during settlement negotiations are

inadmissible "to prove or disprove the validity or amount of a disputed claim or to impeach

by a prior inconsistent statement or a contradiction." Fed.R.Evid. 408(a); see also

Fiberglass Insulators, Inc. v. Dupuy, 856 F.2d 652, 654 (4th Cir. 1988) ("Federal Rule of

Evidence 408 . . . excludes from evidence all statements made in the course of settlement

negotiations." (citation omitted)). Relatedly, communications containing a magistrate

judge's observations about the reasonableness of a party's settlement position are similarly

inadmissible under the local and federal rules. See Shank v. Eagle Techs., Inc., No. RWT-

10-2231, 2013 WL 4442033, at *18 (D.Md. Aug. 15, 2013), report and recommendation

adopted, No. RWT 10-2231, 2013 WL 5487865 (D.Md. Sept. 30, 2013).

Defendants do not dispute the general principle that confidential dispute resolution

communications are inadmissible to prove or disprove the validity or amount of a disputed

claim. Instead, Defendants argue that the Communications are admissible under Federal

Rule of Evidence 408(b), which provides that evidence of compromise or attempts to

compromise, and their associated discussions, may be admitted "for another purpose, such

as proving a witness's bias or prejudice, negating a contention of undue delay, or proving

an effort to obstruct a criminal investigation or prosecution." Fed.R.Evid. 408(b).

Defendants contend that the Communications here are offered not to "prove or disprove

the amount of the Underlying Action" or "to adjudicate the declaratory judgment issue,"

but are instead offered for "another purpose"—that is, to show that T.H.E. acted in bad faith during the settlement negotiations. (Defs.' Opp'n Pl.'s Mot. Strike Confidential Comms. at 6–7, ECF No. 107).

Ultimately, the Court is not persuaded. Although settlement communications may be offered for "another purpose" under Rule 408(b), admitting such communications is nonetheless prohibited if that purpose is "inseparable" from a use that is prohibited under Rule 408(a). See Macsherry v. Sparrows Point, LLC, 973 F.3d 212, 224 (4th Cir. 2020). The Fourth Circuit's decision in Macsherry v. Sparrows Point, LLC, 973 F.3d 212 (4th Cir. 2020), is useful here. In that case, a plaintiff sued his employer under the Maryland Wage Payment and Collection Law ("WPCL") for failing to pay commissions that the plaintiff claimed he was owed under an employment agreement. See id. at 219. The WPCL provides for treble damages when compensation is withheld "not as a result of a bona fide dispute" or in bad faith. See id. at 219. The plaintiff supported his claim for violation of the WPCL for failing to pay the commission and for treble damages with evidence of the following statement by a representative of the defendant, which was made while trying to resolve the dispute: "I know I owe you a commission. I don't believe you deserve a commission as big. What will you take?" See id. at 219. The court ruled that this statement was not admissible under Rule 408(b) because the purpose for which the evidence was offered was "inseparable" from a use prohibited by Rule 408(a). See id. at 224–25. In other words, because the plaintiff's claim for treble damages under the WPCL for withholding payment in bad faith was inseparable from the dispute over whether plaintiff's claim for a commission was valid, submitting the evidence of defendant's settlement communication

to prove bad faith liability was not "another purpose" within the meaning of Rule 408(b). See id..

Applying Macsherry here compels the same result. Defendants seek to introduce evidence that T.H.E. offered an amount $100,000 in excess of the Coverage B limits during settlement negotiations as proof that T.H.E. recognized a "real possibility" that Coverage A applied and therefore was acting in bad faith when it rejected Davis and Spencer's settlement demand that far exceeded the Coverage B limits. (See Opp'n at 21). Importantly, though, the question of whether T.H.E. acted in bad faith is inseparable from the question of whether Coverage A or Coverage B applies to their claims. Because the purpose for which Defendants seek to introduce the Communications is inseparable from a purpose prohibited by Rule 408(a), the Communications are inadmissible. Accordingly, the Court will grant T.H.E.'s Motion to Strike Confidential Communications and will not consider the Considerations when ruling on T.H.E.'s dispositive motion.

**B.    Summary Judgment**

### 1.    Standard of Review

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. Ricci v. DeStefano, 557 U.S. 557, 586 (2009); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers,

or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." Othentec Ltd. v. Phelan, 526 F.3d 135, 141 (4th Cir. 2008) (quoting Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. Anderson, 477 U.S. at 248; see also JKC Holding Co. v. Wash. Sports Ventures, Inc., 264 F.3d 459, 465 (4th Cir. 2001) (citing Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; accord Hooven-Lewis, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of her case where she has the burden of proof,

"there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986).

### 2.    Analysis

T.H.E. moves for summary judgment on its declaratory judgment claim, arguing that Coverage B applies to Davis and Spencer's claims in the Underlying Action as a matter of law. Defendants respond that judgment should be entered in their favor on this claim because it is barred by res judicata. T.H.E. also moves for summary judgment on Davis and Spencer's counterclaims for bad faith. The parties agree that Pennsylvania substantive law applies to both T.H.E.'s declaratory judgment action and Davis and Spencer's counterclaims for bad faith. (See Mem. Law Supp. Pl.'s Mot. Summ. J. at 13, ECF No. 93-1; Opp'n at 17). The Court addresses each argument in turn.

### a.    Res judicata

Defendants cross-move for summary judgment on T.H.E.'s declaratory judgment claim on the grounds that it is barred by the doctrine of res judicata. As T.H.E. points out, the Court previously rejected this argument when it ruled on Defendants' Motion for Judgment on the Pleadings on June 8, 2020. (See Letter Order, ECF No. 78). Under the doctrine of res judicata, "a final judgment forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.'" Taylor v. Sturgell, 553 U.S. 880, 892 (2008) (quoting New Hampshire v. Maine, 532 U.S. 742, 748 (2001)). Three elements must be satisfied for res judicata to apply: "(1) a final judgment on the merits in a prior suit; (2) an identity of the cause of action in both the

earlier and the later suit; and (3) an identity of parties or their privies in the two suits." <u>SAS Inst., Inc. v. World Programming, Ltd.</u>, 874 F.3d 370, 378 (4th Cir. 2017) (quoting <u>Pueschel v. United States</u>, 369 F.3d 345, 354–55 (4th Cir. 2004)). Because Defendants have not introduced any evidence that would disrupt this Court's previous conclusion, the Court finds once again that res judicata is inapplicable here.

First, Defendants have not established common identity or privity among the parties to the Underlying Action and T.H.E.'s declaratory judgment claim. Defendants admit that T.H.E. was not a named party to the Underlying Action. Still, under the doctrine of res judicata, a non-party may be "bound by a judgment if [it] 'assume[d] control' over the litigation in which that judgment was rendered." <u>Taylor</u>, 553 U.S. at 895 (quoting <u>Montana v. United States</u>, 440 U.S. 147, 154 (1979)). As the <u>Taylor</u> Court noted, "the substantive legal relationships justifying preclusion are sometimes collectively referred to as privity." <u>Taylor</u>, 553 U.S. at 894 n.8. Defendants thus assert that T.H.E. should be bound by the Underlying Action because T.H.E. "assumed control over the litigation" and "directed that the counterclaim be filed in order to protect its own interest 'limiting . . . their insurer's liability to [Spencer and Davis].'" (Opp'n at 29 (quoting Underlying Action Am. Answer & Countercl. ¶ 86, ECF No. 63-1)).

At bottom, this assertion is not supported by evidence in the record. Although it is true that T.H.E. retained Karp to defend the Insureds, Karp testified that he suggested filing the interpleader claim in the Underlying Action, not that T.H.E. directed him to do so. (<u>See</u> Daniel Karp Dep. ["Karp Dep."] at 53:11–54:20, ECF No. 98-7). Furthermore, Karp testified that the objective in filing the interpleader claim was to protect the Insureds by

obtaining a release of Davis and Spencer's claims against them in exchange for payment of the Coverage B limits. (See id. at 56:23–57:3, 216:23–217:3). Beyond that, even if the Court were to find that T.H.E. had some degree of control over Karp's decision to file the interpleader claim, Defendants cannot avoid the fact that the Insureds were acting on their own behalf when they entered into the Settlement Agreement when they "expressly exclud[ed]" T.H.E. from its terms. (Settlement Agreement at 3, ECF No. 101-3). For these reasons, Defendants have not established that T.H.E. was in privity with the Insureds for the purposes of the Underlying Action.

Moreover, Defendants cannot establish that T.H.E.'s declaratory judgment claim is based upon the same cause of action as the counterclaim for interpleader in the Underlying Action. As T.H.E. points out, "no court has been presented with evidence and argument in order to decide whether Coverage A or Coverage B applies." (Pl.'s Mem. L. Opp'n Defs.' Cross-Mot. Summ. J. & Reply Supp. Pl.'s Mot. Summ. J. ["Reply"] at 10, ECF No. 101). Thus, it cannot be said that "the present case has already been decided" or that T.H.E. "has previously had a fair shot with respect to the claims raised in the present action." See SAS Inst., 874 F.3d at 378. Indeed, the Court agrees with T.H.E. that dismissing the declaratory judgment claim as res judicata would leave unanswered the critical question of whether Coverage A or Coverage B applies, leaving the parties "no closer to resolving this dispute than they were" at the beginning of this litigation. (See Reply at 10).

Relatedly, Defendants cannot show that the Settlement Agreement in the Underlying Action constitutes a final judgment on the merits of the legal questions at issue here. As the Court noted in its prior opinion, while "the Settlement Agreement and Order

dismissing the Underlying Action constitute final judgments, they do not operate as final judgments as to the questions presented here—that is, whether Coverage A or Coverage B applies." (Letter Order at 5). In other words, although the Settlement Agreement extinguished Davis and Spencer's claims against the Insureds, it did not resolve the separate question of the extent of coverage under the T.H.E. Policy. Defendants have not presented any evidence that alters this conclusion. Accordingly, T.H.E.'s declaratory judgment claim is not res judicata.

### b.   Interpretation of Policy

The central question in this case is whether Coverage A or Coverage B applies to the claims Davis and Spencer asserted in the Underlying Action. T.H.E. posits that Coverage B applies because Davis and Spencer were "passengers" under the Policy at the time of their injuries. Defendants contend that Davis and Spencer were not "passengers" because they outside the basket at the time they were injured and, therefore, Coverage A applies. For the reasons explained below, the Court agrees with T.H.E.

In general, the "[i]nterpretation of an insurance policy is a question of law" for the Court to resolve. Travelers Cas. & Surety Co. v. Castegnaro, 772 A.2d 456, 459 (Pa. 2001) (quoting State Farm Mut. Auto. Ins. Co. v. Universal Underwriters Ins. Co., 701 A.2d 1330, 1331 (Pa. 1997)). "In interpreting the language of an insurance policy, the goal is 'to ascertain the intent of the parties as manifested by the language of the written instrument.'" Kane v. State Farm Fire & Cas. Co., 841 A.2d 1038, 1042 (Pa.Super.Ct. 2003) (quoting Madison Const. Co. v. Harleysville Mut. Ins. Co., 735 A.2d 100, 106 (Pa. 1999)). The Supreme Court of Pennsylvania has instructed that the "polestar of our inquiry . . . is the

language of the insurance policy." <u>Madison</u>, 735 A.2d at 106. "Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer," as the insurer drafted the policy and selected the language that was used therein. <u>See</u> <u>Prudential Property & Cas. Ins. Co. v. Sartno</u>, 903 A.2d 1170, 1177 (Pa. 2006) (quoting <u>Madison</u>, 735 A.2d at 106). Policy terms are ambiguous "if they are subject to more than one reasonable interpretation when applied to a particular set of facts." <u>Kurach v. Truck Ins. Exch.</u>, 235 A.3d 1106, 1116 (Pa. 2020) (quoting <u>Madison</u>, 735 A.2d at 106).

Coverage A provides coverage for "'bodily injury' . . . sustained by any person excluding any 'passenger,'" while Coverage B applies to claims for "'bodily injury' . . . sustained by any 'passenger' arising out of the 'operation of a Hot Air Balloon'." (T.H.E. Policy at 9–10). Thus, in order to determine whether Coverage A or Coverage B applies, the Court must determine whether Davis and Spencer were: "passengers" who sustained injuries "arising out of the 'operation of a Hot Air Balloon.'"

Defendants do not appear to dispute that Davis and Spencer's injuries occurred during the "operation of a Hot Air Balloon" as defined by the Policy. "Operation of a Hot Air Balloon" is defined as: "[A]ll activities related to the preparation of a 'Hot Air Balloon' for flight, 'in flight' activities and the landing and repacking of the balloon." (<u>Id.</u> at 26). "In flight," as used in the definition of "Operation of a Hot Air Balloon," is defined as follows: "'In flight' means that the 'Hot Air Balloon' shall be deemed to be in flight from the time of unpacking with the intention of inflation and flight, until the envelope is repacked including but not limited to tethered operations." (<u>Id.</u> at 25). The Accident here

occurred during landing and before the balloon was repacked. Thus, Davis and Spencer's injuries arose out of the "operation of a Hot Air Balloon."

Defendants dispute, however, that Davis and Spencer were "passengers" at the time of the Accident. "Passenger" is defined as: "[A]ny person, other than the 'pilot in command', in or entering the 'Hot Air Balloon' for the purpose of riding therein or alighting therefrom following a flight or attempted flight, or a crew member." (Id. at 26). "Hot Air Balloon" is defined to include all parts associated with the balloon, including its "gondola," which includes the basket which holds the pilot and passengers. (Id. at 24). Defendants assert that Davis and Spencer were not "passengers" because they were not in the basket at the time they suffered the electric shock. However, Defendants' position is not supported by the facts in the record. Instead, the record evidence confirms that Davis and Spencer had not exited the basket at the time they were electrocuted. Fisher and ground crew member Hart testified that Davis and Spencer were in the basket at all times during the Accident and that they observed Davis and Spencer partially inside the tipped-over basket during and after the electric shock. (See 1st Fisher Dep. at 20:17–24, 21:24–22:18, 28:20–30:4; Hart Dep. at 40:23–41:12). Further, according to T.H.E.'s expert, Davis and Spencer suffered electrical shock injuries when the basket tipped over because Davis and Spencer's upper bodies came in contact with the ground while other parts of their bodies were in contact with electrified parts of the basket. (See Loud Report at 7).

Despite this evidence, Defendants contend that there is a genuine dispute of material fact regarding whether Davis and Spencer were in the basket at the time they were electrocuted because "Fisher testified that Ms. Davis was found outside of the basket, after

the balloon had <u>come to a complete stop and the crew had commenced shut-down</u> <u>procedures.</u>" (Opp'n at 31–32). This is not entirely accurate. Although Fisher testified that the balloon had reached the ground and he started "shutting off the propane" and "pilot lights," (2nd Fisher Dep. at 31:1–2), the Court is not aware of any sworn testimony by Fisher that he found her outside of the basket after the electric shock. The only evidence in the record suggesting that Fisher observed Davis outside of the basket is from attorney Karp's interview memorandum from February 15, 2018. (<u>See</u> Karp Mem. at 11–12, ECF No. 93-25). In that memo, Karp noted that Fisher stated "he found Davis out of the basket, on the other side of the basket from where [Fisher] was, on the ground" and that Spencer was "half in and half out of the balloon, near where Fisher himself had been" after the basket tipped over. (<u>Id.</u>). Notably, Karp's summary of Fisher's recollection is inconsistent with Fisher's sworn testimony and other evidence in the record. In his December 2018 deposition, Fisher testified that he found Davis with the lower part of her body inside the balloon's basket immediately after the electrical shock ended and that he pulled her out of the basket. (1st Fisher Dep. at 20:17–24, 21:7–11). Additionally, in his December 2020 deposition, Fisher reiterated that he was standing in the basket with Spencer at Davis when he first felt the electrical shock. (2nd Fisher Dep. at 75:17–76:1). Karp's memorandum is also inconsistent with Fellows' notes from her August 20, 2015 interview of Fisher, which he gave just days after the Accident. (<u>See</u> T.H.E. Claim File at 2; Fellows Notes at 3–4). Thus, the hearsay statements in Karp's memorandum do not give rise to a genuine dispute of material fact that would defeat summary judgment. <u>See</u> <u>Planmatics, Inc. v. Showers</u>, 137 F.Supp.2d 616, 620 (D.Md. 2001) (noting that "[o]n a motion for summary judgment, a

district court may only consider evidence that would be admissible at trial" (citations omitted)), aff'd, 30 F.App'x 117 (4th Cir. 2002). Because the undisputed record evidence shows that Davis and Spencer were inside the basket at the time of their injuries, they were clearly "passengers" under the Policy. Therefore, Coverage B applies as a matter of law.

Alternatively, T.H.E. argues that even if Davis and Spencer were outside of the basket at the time of the shock, they would nonetheless be considered "passengers" under the Policy because they were "alighting [from the balloon] following a flight." (See T.H.E. Policy at 26). The term "alighting" is not defined under the Policy; thus, the Court must construe the term according to its ordinary meaning. See Dull v. Emp'rs Mut. Cas. Co., 420 A.2d 688, 690 (Pa.Super.Ct. 1980). In doing so, "[c]lear policy language . . . is to be given effect, and courts should not torture the language to create ambiguities but should read the policy provisions to avoid it." Selko v. Home Ins. Co., 139 F.3d 146, 152 n.3 (3d Cir. 1998) (internal quotation marks and citations omitted). "Alight" is commonly defined as: "to come down from something (such as a vehicle)," i.e., to "dismount" or "deplane."[5] Thus, in the context of the Policy, the verb "alighting" means the process of deplaning from the hot air balloon.

With this in mind, the Court finds that the Policy is reasonably construed to mean that a person's status as a "passenger" does not change merely because the balloon has reached the ground or the person has stepped foot out of the basket. This construction finds support from other cases involving aircraft accidents. In Gustafson v. National Insurance

---

[5] First Definition of "Alight," Merriam-Webster, https://www.merriam-webster.com/dictionary/alighting (last visited Aug. 18, 2021).

<u>Underwriters</u>, 517 S.W.2d 414 (Tex.Civ App. 1974), for example, the court held that a passenger who had exited an airplane and was standing on the ground when she was injured by the plane's propeller continued to be a "passenger." <u>See</u> <u>id.</u> at 417–18. Notably, the insurance policy in <u>Gustafson</u> defined "passenger" using wording nearly identical to the definition in the T.H.E. Policy here: "passenger" was defined as "any person in, on or entering the aircraft for the purpose of riding or flying therein or <u>alighting therefrom</u> following a ride, flight or attempted flight therein." <u>See</u> <u>id.</u> at 415–16 (emphasis added). The court identified factors to be considered to determine whether a person is alighting from an aircraft or vehicle, including "continuity of movement, lack of interruption of act of alighting from vehicle and leaving it; proximity to vehicle; elapsed time from a position of being in or on the vehicle and having no contact with it." <u>Id.</u> at 417. The court held that the injured person was alighting from the plane at the time of injury, despite having already reached the ground, and therefore was a "passenger" under the policy. <u>Id.</u> at 417–18.

Similarly, in <u>U.S. Aviation Underwriters, Inc. v. Fitchburg Leominster, Flying Club, Inc.</u>, 42 F.3d 84 (1st Cir. 1994), the court held that a passenger continued to be policy-defined "passenger" after exiting the aircraft. <u>Id.</u> at 86–89. The case involved a plane on a runway and a passenger who was injured by the plane's propeller almost immediately after she had exited the plane. <u>See</u> <u>id.</u> at 85, 89. Like the T.H.E. Policy, the policy at issue contained a $100,000 coverage limit for claims involving "passengers" and a separate higher limit for claims involving non-passengers. <u>See</u> <u>id.</u> at 85, 87. "Passenger" was defined in the policy as "anyone who enters your aircraft to ride in or operate it." <u>Id.</u> The court rejected the insured's argument that the term "passenger" was limited to a person

who was in the aircraft at the time of injury, instead finding that the injured person was a "passenger" even though she had exited the plane before she was injured. Id. at 86–89. Relevant here, the court stated:

> [W]e cannot believe that . . . the insurer could have intended that members and their guests could suddenly find themselves eligible for the million dollar coverage because they were forced to exit an aircraft . . . and subsequently were injured or killed . . . . We conclude that there is a reasonable expectation that "passenger" implies some necessary, unavoidable or frequently encountered situations occurring in connection with and in proximity to, but outside, an aircraft.

Id. at 87 (emphasis added). Therefore, the court concluded that the "fair and reasonable purport [of the policy] is to include [the injured person] as a 'passenger' at the time of her unfortunate accident." Id. at 89.

The rationale set forth in U.S. Aviation Underwriters also applies here. It would make little sense for the Court to construe the Policy in a way that converts an individual from a "passenger" to a non-passenger simply because the individual is injured immediately after inadvertently exiting the basket at some point during the operation of the hot air balloon. Further, like the injured party in Gustafson, Davis and Spencer would still be "alighting" from the balloon even if they fell out of the basket, given that only about fifteen seconds passed between the time the ground crew stabilized the basket and the time the balloon touched the wires. (See 2nd Fisher Dep. at 19:16–22). For these reasons, the Court finds that Davis and Spencer were "passengers" under the Policy.

Further, although caselaw on this precise topic is sparse, the Court can discern a ready analogy from several Pennsylvania cases involving insurance coverage of

automobile accidents. In that context, a person is considered to be "occupying" a vehicle within the meaning of an insurance policy until the person "severs all connection with it." Tyler v. Ins. Co. of N. Am., 457 A.2d 95, 97 (Pa.Super.Ct. 1983). "That point of severance is reached when [the person] becomes highway oriented as opposed to being vehicle oriented." Id. Put differently, "[u]ntil such a person is on his or her own without reference to the [vehicle], the person has not ceased to be a passenger or occupant." Id. Further, the Pennsylvania Supreme Court has established the following four-part test to determine whether a person is "occupying" a vehicle when injured:

> (1) there is a causal relation or connection between the injury and the use of the insured vehicle;
> (2) the person asserting coverage must be in a reasonably close geographic proximity to the insured vehicle, although the person need not be actually touching it;
> (3) the person must be vehicle oriented rather than highway or sidewalk oriented at the time; and
> (4) the person must also be engaged in a transaction essential to the use of the vehicle at the time.

See Utica Mut. Ins. Co. v. Contrisciane, 473 A.2d 1005, 1009 (Pa. 1984).

Notably, Pennsylvania courts have held that, for the purposes of an insurance policy, an individual continues to "occupy" a vehicle even after being ejected from it. See Allstate Fire & Cas. Ins. Co. v. Hymes, 29 A.3d 1169, 1171–73 (Pa.Super.Ct. 2011) (finding that motorcycle driver had a connection to the vehicle where collision caused him to be thrown from the motorcycle and land on the ground twenty feet away); Petra v. Pa. Nat'l Mut. Cas. Ins. Co., No. 505 MDA 2018, 2019 WL 210671, at *3 (Pa.Super.Ct. Jan. 16, 2019) (unpublished memorandum) (holding that motorcycle driver who was ejected from his motorcycle during an accident continued to "occupy" the motorcycle at the time he made

contact with the ground), aff'd, 2019 WL 5624605 (Pa.Super.Ct. Oct. 31, 2019)

(unpublished memorandum). Courts in Pennsylvania have also found that a person

continues to be "vehicle oriented" until he or she has safely exited from a vehicle and

reached a position of safety. See Tyler, 457 A.2d at 98 (holding a passenger who had exited

a bus and was struck by a motorcycle while walking from the bus to the sidewalk remained

"vehicle oriented" and thus was considered an "occupant" of the bus); Lebanon Coach Co.

v. Carolina Cas. Ins. Co., 675 A.2d 279, 281–82 (Pa.Super.Ct. 1996) (finding that a bus

passenger who was injured while crossing the street after getting off a bus had not severed

her connection with the bus and was "using" the bus at the time of her injury); see also

Knoud v. Galante, 696 A.2d 854, 856 (Pa.Super.Ct. 1997) ("A carrier's duty ends when

the passenger has had a reasonable opportunity to alight and pass out of danger." (internal

quotation marks and citations omitted)).

Applying these principles here, it makes sense that Davis and Spencer would be

considered "passengers" under the Policy even if they had been ejected from the basket or

exited the basket on their own volition before being injured by the electrical shock.[6] At the

outset, there is a clear causal connection between Davis' and Spencer's injuries and the use

of the hot air balloon—indeed, the hot air balloon flight was both the but-for and proximate

cause of their injuries. Additionally, even if the Court accepts as true the assertion that

Davis and Spencer were outside the basket at the time of the shock, they were nonetheless

---

[6] Although Defendants vaguely suggest in their briefing that Davis and Spencer had
exited the basket on their own accord prior to the electrical shock, the Court is not aware
of any evidence in the record suggesting this to be the case.

in close geographic proximity to the hot air balloon at the time they were injured. Further, because the safe completion of the flight is a crucial part of any hot air balloon trip, Davis and Spencer were engaged in a transaction essential to the use of the hot air balloon. And finally, Davis and Spencer clearly had not reached a position of safety at the time of their injuries; therefore, they could fairly be construed as "oriented" to the hot air balloon at the time of the shock. Once again, these analogous cases compel the Court to find that Davis and Spencer were "passengers" under the Policy.

For their part, Defendants offer two arguments for why the Policy should be construed in their favor. First, Defendants assert that T.H.E. is subject to a heightened burden on summary judgment because "Coverage B addresses an exclusion created by the broad form coverage afforded by Coverage A in the [P]olicy." (Opp'n at 33). This argument fails. As a general matter, Defendants are correct that "[e]xclusionary clauses . . . are strictly construed against the insurer and in favor of the insured." Swarner v. Mutual Ben. Grp., 72 A.3d 641, 645 (Pa.Super. 2013) (citations omitted). However, despite Defendants' bald assertion that Coverage B operates as an "exclusion" to Coverage A, that is simply not the case here. Rather, Coverage A and Coverage B are alternative coverage provisions that apply separately depending on whether the injured person was a passenger. See U.S. Aviation Underwriters, 42 F.3d at 89 (finding that "policy form contain[ing] certain options covering passengers and certain options covering non-passengers" was "not subject to the special rules of construction for policy exclusions"). Accordingly, T.H.E. is not subject to any heightened burden of proof beyond the typical summary judgment standard.

Defendants also contend that the term "alighting" means "to descend from . . . the air and come to rest," i.e., to "land" or "settle."[7] Thus, according to Defendants, Davis and Spencer were no longer "passengers" because "alighting had been completed prior to the electrocution"; i.e., "landing had been completed prior to the balloon envelope's electrical impact." (Opp'n at 34–35). The Court sees two flaws in Defendants' reasoning. First, Defendants appear to believe that the verb "alighting" refers to the action of the hot air balloon itself. This is not so. Rather, the Policy refers to a "person" "in or entering the 'Hot Air Balloon' for the purpose of riding therein or alighting therefrom following a flight." (T.H.E. Policy at 26 (emphasis added)). Thus, it is the "person" who is "alighting," not the hot air balloon. Second, even if the Court agreed with Defendants' proposed interpretation, it can hardly be said that the hot air balloon had "come to rest" or "settle[d]" at the time of Davis' and Spencer's injuries, as the envelope started to deflate and head towards the power lines within seconds of the balloon's landing. For these reasons, the Court declines to adopt Defendants' strained reading of the Policy.

In sum, the Court finds that the undisputed evidence in the record shows that Davis and Spencer were inside the basket of the hot air balloon at the time of their injuries and, therefore, were clearly "passengers" at the time of the Accident. Further, even if the record evidence showed that Davis and Spencer were outside the basket, they would nonetheless be considered "passengers" under the terms of the Policy. In either case, it is clear that

---

[7] Second Definition of "Alight," Merriam-Webster, https://www.merriam-webster.com/dictionary/alighting (last visited Aug. 18, 2021).

Coverage B applies to the claims Davis and Spencer asserted in the Underlying Action. Accordingly, the Court will enter declaratory judgment in favor of T.H.E.

### c.    Bad Faith

Davis and Spencer assert counterclaims against T.H.E. for contractual bad faith and statutory bad faith. [8] The crux of each claim is that T.H.E. acted in bad faith by determining that Davis and Spencer's claims against the Insureds were subject to Coverage B's $100,000 per passenger limits rather than Coverage A's $1,000,000 per person coverage. The Court considers each claim in turn.

### i.    Contractual Bad Faith

Davis and Spencer's contractual bad faith claim is based on the well-settled common law principle "that insurers have a contractual duty to act in good faith when making decisions to settle." Haugh v. Allstate Ins. Co., 322 F.3d 227, 237 (3d Cir. 2003) (citation omitted). This is because "an insurer assumes a fiduciary responsibility towards its insured and therefore is obligated to act in good faith and with due care when it represents the interests of the insured when dealing with third-party claims brought against the insured." Id. (citation omitted). "[T]he insurer must accord the interest of its insured the same faithful consideration it gives its own interest." Cowden v. Aetna Cas. & Surety

---

[8] Although Davis and Spencer were not T.H.E.'s insureds, they have standing to bring their bad faith claims against T.H.E. because the Insureds assigned such claims to Davis and Spencer as part of the Settlement Agreement in the Underlying Action. (See Settlement Agreement at 4); see also Brown v. Candelora, 708 A.2d 104, 112 (Pa.Super.Ct. 1998) ("Under Pennsylvania law . . . an insured's claims against his or her insurer . . . [for] breach of contract [and] breach of fiduciary duty . . . as well as claims under section 8371 of the Judicial Code for punitive damages, counsel fees and interest, are assignable." (citations omitted)).

Co., 134 A.2d 223, 227 (Pa. 1957). At the same time, however, an insurer is not required to "submerge its own interest in order that the insured's interest may be made paramount." Id. at 228; see also DeWalt v. Ohio Cas. Ins. Co., 513 F.Supp.2d 287, 292 (W.D. Pa. 2007) (noting that the bad faith standard does "not creat[e] an absolute duty for insurance companies to settle claims whenever a possible judgment against their insureds might exceed the amount of coverage"). As such, where an insurer is defending an insured against a third party's liability claim, the insurer's fiduciary obligation is generally limited to settling the claim within the policy limits. See Birth Center v. St. Paul Cos., Inc., 787 A.2d 376, 379 (Pa. 2001). ("Where an insurer refuses to settle a claim that could have been resolved within policy limits without 'a bona fide belief . . . that it has a good possibility of winning,' it breaches its contractual duty to act in good faith and its fiduciary duty to its insured." (emphasis added) (quoting Cowden, 134 A.2d at 229)).

As support for their contractual bad faith claim, Davis and Spencer allege that T.H.E. "never tendered the limits of Coverage A to resolve the personal injury Complaint of Davis and Spencer." (Am. Answer & Countercls. ¶ 72). Davis and Spencer further allege:

> The facts known by T.H.E. Insurance Company by mid September, 2015 mandated an immediate tender of the full policy limits under Coverage A in order to protect their insureds; but T.H.E. Insurance Company made no such tender, and in failing to so tender, failed to properly and reasonably protect its insureds and was guilty of bad faith. . . . Even after Davis and Spencer had filed suit and advised T.H.E. Insurance Company of the fact Davis and Spencer were making a claim under Coverage A of the policy, T.H.E. Insurance Company refused to tender the full policy limits under Coverage A.

(Id. ¶¶ 80, 82). In other words, the premise of Davis and Spencer's contractual bad faith claim is that, because Coverage A applied to their claims against the Insureds, T.H.E. breached its fiduciary duty when it failed to settle within the limits of Coverage A. As established above, however, Coverage B applies to Davis and Spencer's claims in the Underlying Action. T.H.E. offered to settle Davis and Spencer's claims for the full limits of Coverage B on September 21, 2015, and again on May 24, 2018. (See Sept. 21, 2015 Letters; May 24, 2018 Letter at 2). And even though Davis and Spencer were willing to settle their claims against the Insureds for $999,999—one dollar less than the Coverage A limits—T.H.E. had no contractual or fiduciary obligation to offer more than the applicable Coverage B limits. See Birth Center, 787 A.2d at 379 (stating that an insurer's obligation is to settle a claim for an amount within policy limits when reasonable to do so). Because Coverage B applies to Davis and Spencer's claims and T.H.E. offered Coverage B's limits to settle the Underlying Action, T.H.E. did not fail to settle the claims for an amount within the applicable limits. Therefore, T.H.E. is entitled to summary judgment in its favor on Davis and Spencer's counterclaim for contractual bad faith.

## ii.    Statutory Bad Faith

Davis and Spencer bring their statutory bad faith claim pursuant to the Pennsylvania bad faith statute, codified at 42 Pa. C.S.A. § 8371 ("Section 8371"). Although Section 8371 does not define bad faith conduct, the Pennsylvania Supreme Court has explained that:

> [T]o prevail in a bad faith insurance claim pursuant to Section 8371, a plaintiff must demonstrate, by clear and convincing evidence, (1) that the insurer did not have a reasonable basis for denying benefits under the policy and (2) that the insurer

knew or recklessly disregarded its lack of a reasonable basis in
denying the claim.

Rancosky v. Wash. Nat'l Ins. Co., 170 A.3d 364, 376 (Pa. 2017) (citing Terletsky v.
Prudential Prop. & Cas. Ins. Co., 649 A.2d 680, 688 (Pa.Super.Ct. 1994)). The requirement
that the plaintiff prove an insurer's bad faith by clear and convincing evidence means that
the plaintiff must show "that the evidence is so clear, direct, weighty and convincing as to
enable a clear conviction, without hesitation, about whether or not the [insurer] acted in
bad faith." J.C. Penney Life Ins. Co. v. Pilosi, 393 F.3d 356, 367 (3d. Cir. 2004) (quoting
Bostick v. ITT Hartford Grp., Inc., 56 F.Supp.2d 580, 587 (E.D.Pa. 1999)).

Conversely, "an insurer may defeat a claim of bad faith by showing that it had a
reasonable basis for its actions." See Amica Mut. Ins. Co. v. Fogel, 656 F.3d 167, 179 (3d
Cir. 2011) (citation omitted). As such, it is generally true that "there can be no bad faith
claim for denial of coverage if the insurer was correct as a matter of law in denying
coverage." Wehrenberg v. Metro. Prop. & Cas. Ins. Co., 715 F.App'x 209, 213 (3d Cir.
2017) (citation omitted); see also Gallatin Fuels Inc. v. Westchester Fire Ins. Co., 244
F.App'x 424, 435 (3d Cir. 2007) ("[Defendant's] first argument is that failure to provide
coverage cannot be bad faith where there is no duty to provide coverage . . . . [T]his is
surely correct[.]"). In other words, where a bad faith claim is "inextricably tied" to a claim
of an alleged improper denial of coverage, there can be no bad faith if the insurer did not
owe coverage in the first place. See Amitie One Condo. Ass'n v. Nationwide Prop. & Cas.
Ins. Co., No. 1:07-CV-1756, 2010 WL 1052911, at *1 n.2 (M.D.Pa. Mar. 22, 2010) ("If

[the insurer] were to prevail on the contract claim—in other words, if its denial of coverage was proper—then plaintiff's bad faith claim would be doomed.").

Here, Davis and Spencer's claim for bad faith is inextricably tied to their claim that T.H.E. improperly refused to make or accept a settlement offer consistent with Coverage A's limits. But T.H.E.'s refusal to do so was not unreasonable because Coverage B applies to Davis and Spencer's claims. Because there was a reasonable basis for determining that Coverage B applied to Davis and Spencer's claims, Davis and Spencer's bad faith claim under Section 8371 fails as a matter of law.

Davis and Spencer attempt to avoid this conclusion by arguing that, even if Coverage B applies as a matter of law, T.H.E. nonetheless acted in bad faith when it failed to conduct a reasonable investigation into the Accident to determine whether Davis and Spencer were in the basket at the time of their injuries. Specifically, Davis and Spencer take issue with the sufficiency of Fellows' investigation because "[s]he did not hire any investigators or experts to look into the circumstances of what happened," "made no efforts to get a statement from the police," and "did not call any known witnesses." (Opp'n at 6–7). The Court is not convinced. Fellows interviewed Fisher on behalf of T.H.E. on August 20, 2015, just five days after the Accident. During that interview, Fisher told Fellows that he found Davis and Spencer "half way in and out of the basket." (T.H.E. Claim File at 2). The initial NTSB documents and the Factual Report—which T.H.E. obtained in February 2016 and August 2016, respectively—also confirmed that Fisher, Davis, and Spencer were still in the basket at the time the balloon made contact with the power lines. (See Initial NTSB Docs. at 2–16; Factual Report at 3–4). Certainly it was reasonable for T.H.E. to rely

41

on the Factual Report's conclusions—after all, NTSB is the federal agency responsible for investigating aviation accidents, and it prepared the Report using information provided by Fisher, Spencer, and other eyewitnesses who had taken photographs and video of the Accident. Moreover, the first time T.H.E. received any indication that Davis may not have been in the basket at the time of the electric shock was more than two-and-a-half years after the Accident, when Karp prepared a memorandum summarizing his February 2018 interview with Fisher. However, because Karp's summary of Fisher's recollection was inconsistent with Fisher's prior statements and NTSB's conclusions, there was no reason for T.H.E. to change course based on Karp's memorandum alone. In all, there was ample information from which T.H.E. could reasonably and correctly conclude that the electrical shock began while Davis, Spencer, and Fisher were in the basket and, therefore, Coverage B applied. For this reason, Davis and Spencer cannot demonstrate by clear and convincing evidence that T.H.E. failed to conduct an adequate investigation into the Accident.

Beyond that, the record shows that hiring additional investigators, interviewing police or other witnesses, or giving credence to Karp's February 2018 memorandum were not relevant to T.H.E.'s investigation of the claims because Fellows had already reasonably determined that Davis' and Spencer's precise locations were immaterial to whether they were "passengers" under the Policy. Indeed, when Fellows was asked in her deposition whether the information in Karp's memorandum "would increase the potential policy limits," she responded: "No, it doesn't change the policy language between passenger, in flight and operations. There's no – there's no change. She's still a passenger. That the balloon was not packed up and sent away." (Fellows Dep. at 73:17–75:16). Fellows also

testified that T.H.E. "never had any information to change her passenger status" and the information in Karp's memorandum "didn't change the coverage." (<u>Id.</u> at 73:17–75:16). This conclusion was reinforced through T.H.E.'s June 2018 letter, which stated: "even if Plaintiffs' counsel's contention that the Plaintiffs exited the basket prior to the electrical shock occurring is true, . . . Plaintiffs would still be considered 'passengers' for purposes of insurance coverage based on a plain reading of the Policy and relevant case law." (June 11, 2018 Letter at 6).

In sum, Davis and Spencer have not presented clear and convincing evidence that T.H.E. failed to perform an adequate investigation into their claims. To the contrary, the record demonstrates that T.H.E. not only had substantial proof that Davis and Spencer were inside the basket at the time of their injuries, but also that T.H.E. reasonably concluded that Davis' and Spencer's precise locations at the time of the electric shock were irrelevant to whether Coverage A or Coverage B applied to their claims. As such, Davis and Spencer have not shown that this is one of the "exceedingly rare" situations in which an insurer acted in bad faith by failing to conduct a reasonable investigation. <u>See</u> <u>Gallatin Fuels</u>, 244 F.App'x at 435 (stating that the case presented an "exceedingly rare" situation in which the insurer could be liable for bad faith even though the policy had been canceled and no coverage was owed to the insured); <u>see also</u> <u>Wehrenberg</u>, 715 F.App'x at 213 (granting summary judgment for insurer in bad faith failure to investigate claim). T.H.E. is therefore entitled to judgment in its favor on Davis and Spencer's statutory bad faith claim.

### III.    CONCLUSION

For the foregoing reasons, the Court will grant T.H.E.'s Motion to Strike Sommer

Report (ECF No. 102), Motion to Strike Confidential Communications (ECF No. 103), and

Motion for Summary Judgment (ECF No. 93). A separate Order follows.

Entered this 19th day of August, 2021.


_____/s/_____
George L. Russell, III
United States District Judge